IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| LINDA CALDWELL, B-07089, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.  03-1417 |
| | ) |
| CHERYL EWING, THE PUBLICATION REVIEW | ) |
| COMMITTEE, VALERIE LARSON, WARDEN | ) |
| LYNN CAHILL-MASCHING, DONALD SNYDER, | ) |
| MELODY FORD, DUANE TUCKER, CENTRAL | ) |
| PUBLICATION REVIEW COMMITTEE, RAY | ) |
| LOVELL, DOROTHEY CALKIN, PATRICIA | ) |
| KUHSE, DORETTA O'BRIEN, LIEUTENANT | ) |
| JOHNSON, GLENN DAVIDSON, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, CHERYL EWING, LYNN CAHILL-MASCHING,

DONALD SNYDER, MELODY FORD, RAY LOVELL, PATRICIA KUHSE, and DON

JOHNSON, by and through their attorney, Lisa Madigan, Attorney General of the State

of Illinois, and hereby submits their Memorandum of Law in Support of Defendants'

Motion for Summary Judgment.

**INTRODUCTION**

Plaintiff, Linda Caldwell, is a prisoner in the Illinois Department of Corrections.

On June 15, 2004, Plaintiff filed her 42 U.S.C. § 1983 Complaint.  [Court Document #9].

On March 17, 2005, the Court issued an Order ruling that the following issues

remained: 1) Defendants Ewing, Lovell, Cahill-Masching, Snyder, and Ford violated the

Plaintiff's First Amendment rights when Plaintiff was denied free mailings from the Rock

of Ages Prison; 2) Defendants Stanley, Lovell, Cahill-Masching, Snyder and Ford

violated the Plaintiff's First and Fourteenth Amendment rights when Plaintiff was denied various African American magazines; 3) Defendants Ewing, Lovell, Cahill-Masching, Snyder, and Ford violated Plaintiff's First Amendment rights when they took away the "Legal Mail" status on correspondence with the ACLU and the NAACP in retaliation for Plaintiff filing grievances; 4) Defendants Ewing, Lovell, Cahill-Masching, Snyder, and Ford violated Plaintiff's First Amendment rights when they denied the Plaintiff envelopes for her legal mail in retaliation for Plaintiff filing grievances and conducting legal activity; 5) Defendants Kuhse, Johnson, Ewing, Lovell, Cahill-Masching, Snyder, and Ford violated the Plaintiff's First Amendment rights by either opening privileged or legal mail outside of the Plaintiff's presence or causing lengthy delays in receiving said mail; and 6) Defendants Ewing, Lovell, Cahill-Masching, Snyder, and Ford violated the Plaintiff's First Amendment rights to meaningful access to the courts when they delayed legal mail and the Plaintiff missed court deadlines. [Court Document #35].  Defendants assert that they are entitled to summary judgment against the Plaintiff.

## **MATERIAL FACTS CLAIMED TO BE UNDISPUTED**

1.  Defendant Snyder did not sign his name to the Administrative Review Board responses concerning Plaintiff's grievances.  (Exhibit A, Melody Ford Affidavit, ¶ 4).

2.  Instead, Administrative Review Board members Douglas Cravens, Sandra Kibby-Brown, and Leora Harry, designees for Defendant Snyder, signed the Administrative Review Board responses.  (Exhibit A, Melody Ford Affidavit, ¶ 5).

3.  Defendant Ford, an Administrative Review Board member, addressed Plaintiff's appeals concerning self-addressed stamped envelopes, denial of Vibe, Source, Right On, and Sister 2 Sister, confidentiality of legal mail, opening of legal mail, legal mail returned to the facility, envelopes, and mail to the NAACP.  (Exhibit A,

Melody Ford Affidavit, ¶ 7).

4.  Defendant Snyder did not review the grievances at issue or the Administrative Review Board decisions and would not have any independent knowledge of what Plaintiff had alleged in her grievances.  (Exhibit A, Melody Ford Affidavit, ¶ 6).

5.  Based on Defendant Ford's review of Plaintiff's grievances, counselor's responses, and the grievance officer's responses, it appeared that the issues the Plaintiff had raised in the grievances had been appropriately addressed at the institution.  (Exhibit A, Melody Ford Affidavit, ¶ 8-9).

6.  Defendant Ford was not personally involved in decisions concerning whether an inmate is allowed self-addressed stamped envelopes, what magazines an inmate can or cannot receive, what mail is or is not considered "legal mail", or how and when an inmate is provided envelopes as these issues are made at the institution or by members of the Central Publication Review Committee.  (Exhibit A, Melody Ford, ¶ 11-12).

7.  Defendant Ford did not open or delay any of the Plaintiff's legal or privileged mail as said mail is handled by correctional staff at Dwight Correctional Center.  (Exhibit A, Melody Ford Affidavit, ¶ 14-15).

8.  Defendant Ford was not personally involved with the implementation of any Departmental or institutional rules concerning the issues of Plaintiff's Complaint. (Exhibit A, Melody Ford Affidavit, ¶ 13).

9.  Defendant Cahill-Masching's designee, Mary Sigler, signed Defendant's name to grievances filed by the Plaintiff concerning mail handling, mail delivery, self-addressed stamped envelopes, denial of <u>Vibe</u>, <u>Source</u>, <u>Right On</u>, and <u>Sister 2 Sister</u>, confidentiality of legal mail, opening of legal mail, legal mail returned to the facility,

-3-

envelopes, and mail to the NAACP.  (Exhibit B, Cahill-Masching Affidavit, ¶ 4).

10.  Defendant Cahill-Masching was not involved with the final decisions concerning these grievances by the Plaintiff and was not informed that decisions had been made concerning these grievances.  (Exhibit B, Cahill-Masching Affidavit, ¶ 5).

11.  Defendant Cahill-Masching did not personally review and address every offender letter received by her office as said letters would be reviewed and addressed by her designee.  (Exhibit B, Cahill-Masching Affidavit, ¶ 6).

12.  Defendant Cahill-Masching has no knowledge of what, if any, actions were taken in response to specific letters.  (Exhibit B, Cahill-Masching Affidavit, ¶ 6).

13.  From October 27, 1999 to October 26, 2000, Ms. Caldwell was housed in the mental health area in the health care unit of Dwight Correctional Center.  (Exhibit B, Cahill-Masching Affidavit, ¶ 9; Exhibit C, Cheryl Ewing Affidavit, ¶ 5; Exhibit D, Patricia Kuhse Affidavit, ¶ 5; and Exhibit E, Ray Lovell Affidavit, ¶ 5).

14.  From October 26, 2000 through October 27, 2002, Ms. Caldwell was housed in the segregation area of Dwight Correctional Center.  (Exhibit B, Cahill-Masching Affidavit, ¶ 9; Exhibit C, Cheryl Ewing Affidavit, ¶ 5; Exhibit D, Patricia Kuhse Affidavit, ¶ 5; and Exhibit E, Ray Lovell Affidavit, ¶ 5).

15.  Plaintiff is a Christian.  (Exhibit F, Plaintiff's Deposition, p. 9, l. 16-18).

16.  Plaintiff was receiving bible studies from the Rock of Ages Prison.  (Exhibit F, Plaintiff's Deposition, p. 7, l. 5-20).

17.  Plaintiff was using the self-addressed stamped envelopes from the Rock of Ages Prison to send the bible studies back and she would then receive new bible studies.  (Exhibit F, Plaintiff's Deposition, p. 7, l. 21-23; p. 8, l. 1-2).

18.  Plaintiff had a Bible in her possession.  (Exhibit F, Plaintiff's Deposition, p. 9, l. 6-8).

19.  Plaintiff worked on a bible lesson every single day and continues to do so. (Exhibit F, Plaintiff's Deposition, p. 10, l. 9-10).

20.  Other inmates in segregation were having their self-addressed stamped envelopes confiscated.  (Exhibit F, Plaintiff's Deposition, p. 11, l. 11-15).

21.  Offenders in disciplinary segregation status were not allowed to attend communal religious activities due to their heightened security needs and status. (Exhibit B, Cahill-Masching Affidavit, ¶ 10; Exhibit C, Cheryl Ewing Affidavit, ¶ 6; Exhibit D, Patricia Kuhse Affidavit, ¶ 6; and Exhibit E, Ray Lovell Affidavit, ¶ 6).

22.  However, an inmate may subscribe to, solicit free copies of, or buy copies of newspapers, magazines, books and other publications for delivery to the facility.  20 Ill. Admin. Code §525.210(c).  (Exhibit B, Cahill-Masching Affidavit, ¶ 10; Exhibit C, Cheryl Ewing Affidavit, ¶ 6; Exhibit D, Patricia Kuhse Affidavit, ¶ 6; and Exhibit E, Ray Lovell Affidavit, ¶ 6).

23.  Furthermore, a Chaplain was available to address religious concerns for inmates in segregation.  (Exhibit B, Cahill-Masching Affidavit, ¶ 10; Exhibit C, Cheryl Ewing Affidavit, ¶ 6; Exhibit D, Patricia Kuhse Affidavit, ¶ 6; and Exhibit E, Ray Lovell Affidavit, ¶ 6).

24.  Plaintiff had access to a Chaplain who would come to segregation once a month.  (Exhibit F, Plaintiff's Deposition, p. 14, l. 21-23; p. 15, l. 1-3).

25.  Plaintiff would talk with the Chaplain.  (Exhibit F, Plaintiff's Deposition, p. 15, l. 13-15).

26.  In 2001, an inmate who followed Christianity at Dwight Correctional Center could have practiced her religion in her cell by reading her Bible or other religious materials and praying.  (Exhibit B, Cahill-Masching Affidavit, ¶ 11; Exhibit C, Cheryl Ewing Affidavit, ¶ 7; Exhibit D, Patricia Kuhse Affidavit, ¶ 7; and Exhibit E, Ray Lovell Affidavit, ¶ 7).

27.  Furthermore, if the inmate had made a request through the Chaplaincy Department, the Chaplain could have come to her cell to address the inmate's religious issues or concerns.  (Exhibit B, Cahill-Masching Affidavit, ¶ 11; Exhibit C, Cheryl Ewing Affidavit, ¶ 7; Exhibit D, Patricia Kuhse Affidavit, ¶ 7; and Exhibit E, Ray Lovell Affidavit, ¶ 7).

28.  Self-addressed envelopes with pre-paid postage are considered contraband since they can be used and traded with other inmates like money.  (Exhibit B, Cahill-Masching Affidavit, ¶ 7; Exhibit C, Cheryl Ewing Affidavit, ¶ 3; Exhibit D, Patricia Kuhse Affidavit, ¶ 3; and Exhibit E, Ray Lovell Affidavit, ¶ 3).

29.  Any correctional employee who observed an inmate having self-addressed envelopes would have confiscated same.  (Exhibit B, Cahill-Masching Affidavit, ¶ 7; Exhibit C, Cheryl Ewing Affidavit, ¶ 3; Exhibit D, Patricia Kuhse Affidavit, ¶ 3; and Exhibit E, Ray Lovell Affidavit, ¶ 3).

30.  Possessing contraband and trading and trafficking are violations of Departmental rules.  20 Ill. Admin. Code 504 App. A, 20 Ill. Admin. Code 504 Table A.

31.  Plaintiff believes that it was Defendant Ewing who was confiscating the self-addressed stamped envelopes.  (Exhibit F, Plaintiff's Deposition, p. 23, l. 7-10).

32.  Plaintiff had a one year subscription to Vibe but no subscription to Source, Right On, or Sister to Sister.  (Exhibit F, Plaintiff's Deposition, p. 25, l. 1-14).

33.  Dwight Correctional Center at one time had a subscription to <u>Source</u>, <u>Right On</u>, or <u>Sister to Sister</u>.  (Exhibit F, Plaintiff's Deposition, p. 26, l. 18-21).

34.  The magazine Plaintiff personally had confiscated was <u>Vibe</u>.  (Exhibit F, Plaintiff's Deposition, p. 27, l. 16-19).

35.  Plaintiff was able to have a couple <u>Vibe</u> magazines.  (Exhibit F, Plaintiff's Deposition, p. 28, l. 7-11).

36.  Plaintiff had a conversation with Beatrice Standley who told the Plaintiff that she could not have the magazines because they were a threat to security.  (Exhibit F, Plaintiff's Deposition, p. 29, l. 12-15; p. 30, l. 1-11).

37.  Ms. Standley told the Plaintiff that the decision was made by the Publication Review Committee.  (Exhibit F, Plaintiff's Deposition, p. 30, l. 15-22).

38.  Plaintiff does not know if Caucasian magazines were confiscated during the time-frame of her complaint.  (Exhibit F, Plaintiff's Deposition, p. 36, l. 6-9).

39.  Mail Room staff review all incoming publications for questionable materials. (Exhibit B, Cahill-Masching Affidavit, ¶ 12; Exhibit C, Cheryl Ewing Affidavit, ¶ 8; Exhibit D, Patricia Kuhse Affidavit, ¶ 8; and Exhibit E, Ray Lovell Affidavit, ¶ 8).

40.  Questionable materials may include, but not be limited to, items showing or representing contraband, obscenity, security issues, or significant connections with gangs, i.e. materials that contain or could raise potential security issues within the correctional center.  (Exhibit B, Cahill-Masching Affidavit, ¶ 13; Exhibit C, Cheryl Ewing Affidavit, ¶ 9; Exhibit D, Patricia Kuhse Affidavit, ¶ 9; and Exhibit E, Ray Lovell Affidavit, ¶ 9).

41.  If publications come in that may contain questionable content, the publication may be forwarded to the Illinois Department of Corrections Central

Publication Review Committee in Springfield, Illinois.  (Exhibit B, Cahill-Masching Affidavit, ¶ 14; Exhibit C, Cheryl Ewing Affidavit, ¶ 10; Exhibit D, Patricia Kuhse Affidavit, ¶ 10; and Exhibit E, Ray Lovell Affidavit, ¶ 11).

42.  The Central Publication Review Committee would then make the final decision concerning whether or not the publication would be accepted, denied, or approved with the removal of certain pages.  (Exhibit B, Cahill-Masching Affidavit, ¶ 15; Exhibit C, Cheryl Ewing Affidavit, ¶ 11; Exhibit D, Patricia Kuhse Affidavit, ¶ 11; and Exhibit E, Ray Lovell Affidavit, ¶ 12).

43.  Plaintiff did not contact the Central Publication Review Committee to find out why she could not have issues of <u>Vibe</u>.  (Exhibit F, Plaintiff's Deposition, p. 37, l. 19-22).

44.  Defendants Snyder, Cahill-Masching, Ewing, Ford, Lovell, Kuhse, and Johnson were not members of the Central Publication Review Committee.  (Exhibit A, Melody Ford Affidavit, ¶ 11; Exhibit B, Cahill-Masching Affidavit, ¶ 16; Exhibit C, Cheryl Ewing Affidavit, ¶ 12; Exhibit D, Patricia Kuhse Affidavit, ¶ 12; and Exhibit E, Ray Lovell Affidavit, ¶ 13).

45.  The Central Publication Review Committee maintains a listing of various magazines which provides what issues are approved, disapproved, or approved with the removal of certain pages.  (Exhibit B, Cahill-Masching Affidavit, ¶ 17; Exhibit C, Cheryl Ewing Affidavit, ¶ 13; Exhibit D, Patricia Kuhse Affidavit, ¶ 13; and Exhibit E, Ray Lovell Affidavit, ¶ 14).

46.  Once a publication has been placed on the Central Publication Review Committee's disapproved list, the institution does not have the discretion to perform a further review and/or remove a publication from the list.  (Exhibit B, Cahill-Masching Affidavit, ¶ 18; Exhibit C, Cheryl Ewing Affidavit, ¶ 14; Exhibit D, Patricia Kuhse

Affidavit, ¶ 14; and Exhibit E, Ray Lovell Affidavit, ¶ 15).

47.  For the 2001 <u>Vibe</u> magazine, the January, February, March, April, May, June, and July issues were allowed if certain pages were removed.  The issues for August, September, October, November, and December were disapproved in their entirety.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 16; Exhibit D, Patricia Kuhse Affidavit, ¶ 15; Exhibit E, Ray Lovell Affidavit, ¶ 17).

48.  Defendants Snyder, Cahill-Masching, Ewing, Ford, Lovell, Kuhse, and Johnson did not personally ban the Plaintiff from receiving <u>Vibe</u>, <u>Source</u>, <u>Right On</u>, or <u>Sister 2 Sister</u>.  (Exhibit B, Cahill-Masching Affidavit, ¶ 19; Exhibit C, Cheryl Ewing Affidavit, ¶ 17; Exhibit D, Patricia Kuhse Affidavit, ¶ 16; and Exhibit E, Ray Lovell Affidavit, ¶ 18).

49.  The Mail Room staff was responsible for determining the legitimacy of every piece of incoming and outgoing offender mail before releasing the mail for delivery to the offender or the post office.  (Exhibit B, Cahill-Masching Affidavit, ¶ 21; Exhibit C, Cheryl Ewing Affidavit, ¶ 21; Exhibit D, Patricia Kuhse Affidavit, ¶ 18; and Exhibit E, Ray Lovell Affidavit, ¶ 20).

50.  Defendants Snyder, Cahill-Masching, Ford, Lovell, Kuhse, and Johnson did not have any personal involvement concerning the legitimacy of mail or how it is processed.  (Exhibit A, Melody Ford Affidavit, ¶ 11; Exhibit B, Cahill-Masching Affidavit, ¶ 22; Exhibit D, Patricia Kuhse Affidavit, ¶ 19; and Exhibit E, Ray Lovell Affidavit, ¶ 10).

51.  Defendant Kuhse's only involvement with the Plaintiff's mail would have been to deliver it to her at her cell.  (Exhibit D, Patricia Kuhse Affidavit, ¶ 20).

52.  There are two types of incoming mail, privileged and non-privileged.  20 Ill. Admin. Code §525.140.  Incoming privileged mail is mail from the: 1) Director of the

Illinois Department of Corrections; 2) deputy and assistant deputy directors of the Illinois Department of Corrections; 3) Department of Corrections attorneys; 4) members from the Administrative Review Board; 5) members of the Prison Review Board; 6) Illinois Governor; 7) federal or Illinois legislators; 8) Chief Executive Officers from the FBI, DEA, Criminal Division of the Department of Justice, U.S. Customs Service, Secret Service, Illinois State Police, and Illinois Sheriff's offices and Police departments; 9) John Howard Association; and 10) legal mail.  20 Ill. Admin. Code §525.110(e)(1-10). (Exhibit C, Cheryl Ewing Affidavit, ¶ 22).

53.   Non-privileged incoming mail would be mail from the clerks of courts and mail not meeting the definition of privileged incoming mail. 20 Ill. Admin. Code §§ 525.140(d), 525.110.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 23).

54.   Outgoing privileged mail is mail to: 1) the Director; 2) Associate Director, Chiefs, Deputy Directors, Deputy Chiefs, and Assistant Deputy Directors of the Department; 3) Department attorneys; 4) Members of the Administrative Review Board; 5) Members of the Prisoner Review Board; 6) the Governor of Illinois; 7) Federal or Illinois legislators; 8) Chief Executive Officers of the Federal Bureau of Investigation, the Drug Enforcement Administration, the Criminal Division of the Department of Justice, the United States Customs Service, the Secret Service, the Illinois State Police, and Sheriff's Offices and Police Departments in the State of Illinois; 9) John Howard Association; 10) Clerks of courts or of the Illinois Court of Claims; and 11) Legal mail. (Exhibit C, Cheryl Ewing Affidavit, ¶ 24).

55.   Legal mail is defined as mail from: 1) registered attorneys, but not including Illinois Department of Corrections attorneys; 2) the Illinois Attorney General's Office; 3) Judges or Magistrates of any court and Judges from the Illinois Court of Claims; and 4)

any organization that provides legal representation to incarcerated individuals, but that does not include referral agencies. 20 Ill. Admin. Code §525.110(g)(1-4). (Exhibit C, Cheryl Ewing Affidavit, ¶ 25).

56. Legal mail would be opened only if the legitimacy could not be substantiated from information available on the outside of the mailing. (Exhibit C, Cheryl Ewing Affidavit, ¶ 26; Exhibit D, Patricia Kuhse Affidavit, ¶ 21).

57. Legitimate legal mail from recognized attorneys was opened in the offender's presence, checked for contraband and scanned to ensure it is legal mail from the noted correspondent. (Exhibit C, Cheryl Ewing Affidavit, ¶ 27; Exhibit D, Patricia Kuhse Affidavit, ¶ 22).

58. Mail inappropriately marked as legal mail or from correspondents not recognized by the Department of Corrections as legal was inspected and read for content as non-privileged mail. (Exhibit C, Cheryl Ewing Affidavit, ¶ 27; Exhibit D, Patricia Kuhse Affidavit, ¶ 22).

59. Plaintiff wrote the ACLU and NAACP to seek if they would represent her. (Exhibit F, Plaintiff's Deposition, p. 38, l. 13-17).

60. The ACLU did not say they would represent the Plaintiff and the NAACP was assisting Plaintiff by telling her to use the grievance procedure. (Exhibit F, Plaintiff's Deposition, p. 38, l. 21-23; p. 39, l. 1-9).

61. Plaintiff did not speak with any particular attorney with the NAACP. (Exhibit F, Plaintiff's Deposition, p. 44, l. 4-7).

62. Mail addressed to the NAACP or ACLU was not considered legal mail as said agencies were considered referral agencies. (Exhibit C, Cheryl Ewing Affidavit, ¶

28).

63.  If mail to said entities had been addressed to a specific attorney, the correspondence could have been considered legal mail.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 28).

64.  Additionally, mail being returned to sender from the United State Post Office as non-deliverable was opened and inspected for non-legal contents such as contraband or unauthorized communications between offenders.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 29).

65.  It is not uncommon for inmates to communicate with each other in violation of Departmental rules by placing another inmate's return address on the envelope and sending it out to an entity knowing it would be returned as undeliverable in the hopes of having the correspondence delivered to the inmate whose name appears as the return addressee.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 29).

66.  Therefore, mail being returned as non-deliverable was opened to ensure that the offender noted as the return addressee actually generated the enclosed correspondence.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 29).

67.  If the mail appeared to be in compliance, it was not read for content before being returned to the offender.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 29).

68.  Legal mail for offenders in strip cells or out of the facility was returned to the Mail Room unopened and re-issued when the offender had been removed from the strip cell or returned from being out of the facility.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 30; Exhibit D, Patricia Kuhse Affidavit, ¶ 23).

69.  Due to the large amounts of mail received and to be delivered, Plaintiff's legal mail was never read for content.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 31; Exhibit

D, Patricia Kuhse Affidavit, ¶ 24).

70.  Instead, a quick visual scan of the mail would be done to determine that the mail was legal in nature.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 31; Exhibit D, Patricia Kuhse Affidavit, ¶ 24).

71.  If it was, it was processed as legal mail.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 31; Exhibit D, Patricia Kuhse Affidavit, ¶ 24).

72.  Defendants did not personally delay the Plaintiff's incoming or outgoing mail. (Exhibit A, Melody Ford Affidavit, ¶ 14; Exhibit B, Cahill-Masching Affidavit, ¶ 23; Exhibit C, Cheryl Ewing Affidavit, ¶ 32; Exhibit D, Patricia Kuhse Affidavit, ¶ 25; and Exhibit E, Ray Lovell Affidavit, ¶ 10).

73.  Defendants did not personally dispense indigent/legal envelopes as that is an act that is handled by library staff at Dwight Correctional Center.  (Exhibit A, Melody Ford Affidavit, ¶ 11; Exhibit B, Cahill-Masching Affidavit, ¶ 24; Exhibit C, Cheryl Ewing Affidavit, ¶ 34; Exhibit D, Patricia Kuhse Affidavit, ¶ 26; and Exhibit E, Ray Lovell Affidavit, ¶ 21).

74.  Plaintiff could get envelopes from the law library or from the commissary. (Exhibit F, Plaintiff's Deposition, p. 55, l. 3-10).

75.  Plaintiff asked Ms. Larson for the envelopes.  (Exhibit F, Plaintiff's Deposition, p. 56, l. 16-18).

76.  Plaintiff does not know if any of the Defendants told Ms. Larson to not give Plaintiff the envelopes.  (Exhibit F, Plaintiff's Deposition, p. 56, l. 19-23; p. 57, l. 1-4).

77.  No one told the Plaintiff that she was being denied envelopes and legal mail status because she had filed grievances.  (Exhibit F, Plaintiff's Deposition, p. 55, l. 20-23; p. 56, l. 1-7).

-13-

78.  Plaintiff once had a federal case in the Central District in which there was a ruling and her case was dismissed.  (Exhibit F, Plaintiff's Deposition, p. 71, l. 16-20).

79.  However, Plaintiff wrote the Court, explained what happened, and her case was re-instated.  (Exhibit F, Plaintiff's Deposition, p. 71, l. 20-23; p. 72, l. 11; p. 76, l. 12-16).

80.  Any other time she had a delay with a court deadline, she was able to get an extension.  (Exhibit F, Plaintiff's Deposition, p. 76, l. 17-23; p. 77, l. 1-3).

81.  Defendant Lovell's involvement with the Plaintiff would have been as a Grievance Officer for a grievance that Plaintiff may have filed.  (Exhibit E, Ray Lovell Affidavit, ¶ 22).

82.  Defendant Lovell was the Grievance Officer for several of the Plaintiff's grievances.  (Exhibit E, Ray Lovell Affidavit, ¶ 23).

83.  Defendant Lovell specifically addressed issues the Plaintiff had concerning self-addressed stamped envelopes, <u>Vibe</u>, <u>Source</u>, <u>Right On</u>, or <u>Sister 2 Sister</u>, confidentiality of legal mail, mail handling, Mail Room procedures, and legal envelopes. (Exhibit E, Ray Lovell Affidavit, ¶ 23).

84.  When Defendant Lovell received these grievances, he would review the Counselor's response, possibly interview the Plaintiff, possibly interview correctional staff, and review relevant Departmental rules concerning the matter.  (Exhibit E, Ray Lovell Affidavit, ¶ 24).

85.  Defendant Lovell would then make a recommendation concerning the Plaintiff's grievance.  (Exhibit E, Ray Lovell Affidavit, ¶ 25).

86.  Based on the information provided to Defendant Lovell, he recommended that the Plaintiff's aforementioned grievances be denied or considered moot.  (Exhibit

E, Ray Lovell Affidavit, ¶ 26).

87.  Defendant Lovell, as a Grievance Officer, could only check out the information given to himself and make a determination based on the information he received.  (Exhibit E, Ray Lovell Affidavit, ¶ 27).

88.  Defendant Johnson opened legal mail in the inmate's presence.  (Exhibit G, Johnson's Responses to Plaintiff's Second Interrogatories, request # 5).

89.  Defendant Johnson would, as a security precaution, scan the letterhead to make sure that it matched the return address on the envelope.  (Exhibit G, Johnson's Responses to Plaintiff's Second Interrogatories, request # 6).

90.  Plaintiff's denial of "Legal Mail" status to her correspondence with the ACLU and the NAACP and/or the denial of indigent envelopes to her was not done in retaliation for her legal activities and writing of grievances.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 18; Exhibit D, Patricia Kuhse Affidavit, ¶17).

91.  Defendant Ewing would not have looked at an inmate's masterfile prior declining "Legal Mail" status to see what grievances Plaintiff had or had not filed and Defendant Ewing had no personal involvement in the handling of inmate grievances and lawsuits against Dwight Correctional Center or it's staff.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 19).

92.  Even if the Plaintiff had filed grievances and a lawsuit against Dwight Correctional Center employees, Defendant Ewing would have still been required to ensure that the Plaintiff did not receive or send mail that could possibly be considered contraband.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 20).

## SUMMARY JUDGMENT STANDARD

## APPLICABLE LAW

Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Only disputes over facts that might affect the outcome of the suit, under the governing law, will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In making this determination, the court is to draw inferences from the record in the light most favorable to the non-moving party.  The court is not required, however, to draw every conceivable inference; rather, it may draw only those that are reasonable.  DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 333 (7th Cir. 1986).

The Seventh Circuit clarified the standard further in Collins v. Associated Pathologists, Ltd., 844 F.2d 473 (7th Cir. 1988), cert. denied, 488 U.S. 852 (1988):

> The existence of a triable issue is no longer sufficient to survive a motion for summary judgment . . . the test for summary judgment is whether sufficient evidence exists in the pre-trial record to allow the non-moving party to survive a motion for directed verdict.  Id. at 476.

The United States Supreme Court in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), established that a party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which the party has the burden of proof.  Brazinski v. Amoco Petroleum Additives Co., 6 F.3d 1176, 1183 (7th Cir. 1993).  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine" issue for trial.  Mechnig v. Sears,

Roebuck & Co., 864 F.2d 1359 (7th Cir. 1988).  The Plaintiff must come forward with evidence of a specific factual dispute, evidence that would reasonably permit the finder of fact to find in Plaintiff's favor on a material question; otherwise, the court must enter summary judgment against the Plaintiff.  Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994); International Union of Operating Engineers v. Associated General Contractors, 845 F.2d 704, 708 (7th Cir. 1988).

## ARGUMENT

Defendants assert that in light of the facts claimed to be undisputed, Plaintiff's case, alleging violations of her First and Fourteenth Amendment rights fails as a matter of law.

### PERSONAL INVOLVEMENT

### APPLICABLE LAW

Liability under §1983 requires that there be a direct, personal responsibility on the defendant's part for those acts or omissions claimed to have deprived plaintiff of his rights.  Crowder v. Lash, 687 F.2d 996, 1005 (7th Cir. 1982); Duncan v. Duckworth, 644 F.2d 653, 655 (7th Cir. 1981).  To be personally involved, defendants must act (or fail to act) with a deliberate or reckless disregard of plaintiff's constitutional rights or must direct or knowingly consent to the conduct alleged to constitute the violation.  Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985).  "Section 1983 will not support a claim based on a *respondeat superior* theory of liability."  Polk County v. Dodson, 102 S.Ct. 445, 453 (1981).  A supervisory official can be liable only for his own misconduct, not that of those under his supervision.  Duckworth v. Franzen, 780 F.2d 645 (7th Cir. 1985).  Thus, a supervisory official must be personally involved in the alleged conduct to be liable. Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988).

## ARGUMENT

**PLAINTIFF IS UNABLE TO PROVE THE PERSONAL INVOLVEMENT OF THE DEFENDANTS IN THE ALLEGED VIOLATIONS OF HER CONSTITUTIONAL RIGHTS.**

### Grievances

Defendant Snyder did not sign his name to the Administrative Review Board responses concerning Plaintiff's grievances.  (Exhibit A, Melody Ford Affidavit, ¶ 4). Instead, Administrative Review Board members Douglas Cravens, Sandra Kibby-Brown, and Leora Harry, designees for Defendant Snyder, signed the Administrative Review Board responses.  (Exhibit A, Melody Ford Affidavit, ¶ 5).  Defendant Snyder did not review the grievances at issue or the Administrative Review Board decisions and would not have any independent knowledge of what Plaintiff had alleged in her grievances.  (Exhibit A, Melody Ford Affidavit, ¶ 6).  Defendant Cahill-Masching's designee, Mary Sigler, signed Defendant's name to grievances filed by the Plaintiff concerning mail handling, mail delivery, self-addressed stamped envelopes, denial of Vibe, Source, Right On, and Sister 2 Sister, confidentiality of legal mail, opening of legal mail, legal mail returned to the facility, envelopes, and mail to the NAACP.  (Exhibit B, Cahill-Masching Affidavit, ¶ 4).  Defendant Cahill-Masching was not involved with the final decisions concerning these grievances by the Plaintiff and was not informed that decisions had been made concerning these grievances.  (Exhibit B, Cahill-Masching Affidavit, ¶ 5).  As such, Defendants Snyder and Cahill-Masching have no personal involvement in the alleged violation of Plaintiff's constitutional rights.  Therefore, unless Plaintiff can otherwise prove that Defendants Snyder and Cahill-Masching were personally involved in the violation of Plaintiff's constitutional rights by his and her actual participation in the violation, summary judgment on this issue should be entered

in favor of Defendants Snyder and Cahill-Masching and against the Plaintiff.

**Mail**

Defendants Snyder, Cahill-Masching, Ford, Lovell, Kuhse, and Johnson did not have any personal involvement concerning the legitimacy of mail or how it is processed. (Exhibit A, Melody Ford Affidavit, ¶ 11; Exhibit B, Cahill-Masching Affidavit, ¶ 22; Exhibit D, Patricia Kuhse Affidavit, ¶ 19; and Exhibit E, Ray Lovell Affidavit, ¶ 10). As such, Defendants Snyder, Cahill-Masching, Ford, Lovell, Kuhse, and Johnson have no personal involvement in the alleged violation of Plaintiff's constitutional rights. Therefore, unless Plaintiff can otherwise prove that Defendants Snyder, Cahill-Masching, Ford, Lovell, Kuhse, and Johnson were personally involved in the violation of Plaintiff's constitutional rights by his and her actual participation in the violation, summary judgment on this issue should be entered in favor of Defendants Snyder, Cahill-Masching, Ford, Lovell, Kuhse, and Johnson and against the Plaintiff.

**Magazines**

Plaintiff had a conversation with Beatrice Standley who told the Plaintiff that she could not have the magazines because they were a threat to security. (Exhibit F, Plaintiff's Deposition, p. 29, l. 12-15; p. 30, l. 1-11). Ms. Standley told the Plaintiff that the decision was made by the Publication Review Committee. (Exhibit F, Plaintiff's Deposition, p. 30, l. 15-22). If publications come in that may contain questionable content, the publication may be forwarded to the Illinois Department of Corrections Central Publication Review Committee in Springfield, Illinois. (Exhibit B, Cahill-Masching Affidavit, ¶ 14; Exhibit C, Cheryl Ewing Affidavit, ¶ 10; Exhibit D, Patricia Kuhse Affidavit, ¶ 10; and Exhibit E, Ray Lovell Affidavit, ¶ 11). The Central Publication Review Committee would then make the final decision concerning whether or not the

publication would be accepted, denied, or approved with the removal of certain pages. (Exhibit B, Cahill-Masching Affidavit, ¶ 15; Exhibit C, Cheryl Ewing Affidavit, ¶ 11; Exhibit D, Patricia Kuhse Affidavit, ¶ 11; and Exhibit E, Ray Lovell Affidavit, ¶ 12). Defendants Snyder, Cahill-Masching, Ewing, Ford, Lovell, Kuhse, and Johnson were not members of the Central Publication Review Committee.  (Exhibit A, Melody Ford Affidavit, ¶ 11; Exhibit B, Cahill-Masching Affidavit, ¶ 16; Exhibit C, Cheryl Ewing Affidavit, ¶ 12; Exhibit D, Patricia Kuhse Affidavit, ¶ 12; and Exhibit E, Ray Lovell Affidavit, ¶ 13).  As such, Defendants Snyder, Cahill-Masching, Ewing, Ford, Lovell, Kuhse, and Johnson have no personal involvement in the alleged violation of Plaintiff's constitutional rights.  Therefore, unless Plaintiff can otherwise prove that Defendants Snyder, Cahill-Masching, Ewing, Ford, Lovell, Kuhse, and Johnson were personally involved in the violation of Plaintiff's constitutional rights by his and her actual participation in the violation, summary judgment on this issue should be entered in favor of Defendants Snyder, Cahill-Masching, Ewing, Ford, Lovell, Kuhse, and Johnson and against the Plaintiff.

**Envelopes**

Defendants did not personally dispense indigent/legal envelopes as that is an act that is handled by library staff at Dwight Correctional Center.  (Exhibit A, Melody Ford Affidavit, ¶ 11; Exhibit B, Cahill-Masching Affidavit, ¶ 24; Exhibit C, Cheryl Ewing Affidavit, ¶ 34; Exhibit D, Patricia Kuhse Affidavit, ¶ 26; and Exhibit E, Ray Lovell Affidavit, ¶ 21).  Plaintiff admits that she asked Ms. Larson for the envelopes.  (Exhibit F, Plaintiff's Deposition, p. 56, l. 16-18).  Plaintiff does not know if any of the Defendants told Ms. Larson to not give Plaintiff the envelopes.  (Exhibit F, Plaintiff's Deposition, p. 56, l. 19-23; p. 57, l. 1-4).  As such, Defendants have no personal

involvement in the alleged violation of Plaintiff's constitutional rights.  Therefore, unless Plaintiff can otherwise prove that Defendants were personally involved in the violation of Plaintiff's constitutional rights by his and her actual participation in the violation, summary judgment on this issue should be entered in favor of Defendants and against the Plaintiff.

## FIRST AMENDMENT AND FOURTEENTH AMENDMENT

## APPLICABLE LAW

When a person is incarcerated, that person retains the right to practice their religion to the extent that the practice is compatible with the legitimate penological interests of the State.  Turner v. Safely, 107 S. Ct. 2254 (1987).  The Court also held that such a standard is necessary if prison administrators and not the courts, are to make the difficult judgments concerning institutional operations.  Turner at 2261.  "Both security and economic concerns are legitimate penological demands."  Mustafa Al-Alamin v. Gramley, 926 F.2d 680, 686 (7th Cir. 1991).  In fact, "[a] prison needs make only reasonable efforts to afford the inmates opportunity to practice their faith."  926 F.2d at 688.  Furthermore, the court, as it must, accords prison officials wide-ranging deference in adopting policies that are needed to preserve internal order and security and the court will not substitute its judgment for theirs in the absence of substantial evidence in the record to indicate officials have exaggerated their response to these considerations.  Caldwell v. Miller, 790 F.2d 589 at 596 (7th Cir. 1986).

"[I]t is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under §1983 even if the act, when taken for different reasons, would have been proper." Buise v. Hudkins, 584 F.2d 223, 229 (7th Cir. 1978), cited in Matzker v. Herr, 748 F.2d 1142, 1150-51 (7th Cir. 1984) (reversing

-21-

dismissal for failure to state a claim where pretrial detainee complained he was left in an allegedly dangerous cell block in retaliation for his prior complaint to court).  A prison official cannot retaliate against an inmate because the inmate wrote and filed a grievance even if the adverse action does not by itself violate the constitution.  DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000), Babcock v. White, 102 F.3d 267, 275 (7th Cir, 1996).

However, a prison can regulate inmate speech as long as the regulation is reasonably related to a legitimate penological interest such as crime deterrence, institutional security, or rehabilitation.  Thornburgh v. Abbott, 490 U.S. 401, 413, 109 S.Ct. 1874 (1989).  There is a balancing test to determine when a regulation can be sustained as reasonably related to legitimate penological interest.  Turner v. Safley, 482 U.S. 85; 107 S.Ct. 2254 (1987).  See also Hadi v. Horn, 830 F.2d 779,783 (7th Cir. 1987) ("Prisoners' rights to be afforded a reasonable opportunity to exercise their First Amendment rights must be balanced against the legitimate goals of the penal institution.").  This balancing test has four considerations which include a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it (Block v. Rutherford, 468 U.S. 576, 104 S.Ct. 3227 (1984)); whether there are alternative means of exercising the right that remain open to prison inmates; the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and the absence of ready alternatives.  Turner at 89.  "Both security and economic concerns are legitimate penological demands." Mustafa Al-Alamin v. Gramley, 926 F.2d 680,686 (7th Cir. 1991). In fact, "[a] prison needs make only reasonable efforts to afford the inmates an opportunity to practice their faith." 926 F.2d at 688.

In order for a Plaintiff to prevail on an equal protection claim under 42 U.S.C. §1983, she must show an intentional discrimination against him because of her membership in a particular class, not merely that she was treated unfairly as an undefinable group of individuals.  Sherwin Manor Nursing Center, Inc. v. McAuliffe, 37 F.3d 1216 1220 (7th Cir. 1994), Huebschen v. Department of Health and Social Services, 716 F.2d 1167, 1171 (7th Cir. 1983), Trautvetter v. Quick, 916 F.2d 1140, 1150 (7th Cir. 1990).  Plaintiff must further show that any deprivation was based on an unjustifiable standard such as race, religion, or other arbitrary classification. Vukandinovich v. Bartels, 853 F.2d 1387 (7th Cir. 1988), Government of the Virgin Island v. Harrigan, 791 F.2d 34 (3rd Cir. 1988).

## ARGUMENT

**PLAINTIFF'S FIRST AMENDMENT RIGHTS WERE NOT VIOLATED CONCERNING THE CONFISCATION OF THE SELF-ADDRESSED STAMPED ENVELOPES, MAGAZINES, AND MAIL AND SHE HAS FAILED TO PROVE THAT THE DEFENDANTS' ACTS WERE IN RETALIATION FOR PLAINTIFF'S FILING GRIEVANCES AND LAWSUITS.**

### Self-Addressed Envelopes

There was a valid penological interest in confiscating the self-addressed envelopes and Plaintiff had alternative means to practice her religion.  From October 26, 2000 through October 27, 2002, Ms. Caldwell was housed in the segregation area of Dwight Correctional Center.  (Exhibit B, Cahill-Masching Affidavit, ¶ 9; Exhibit C, Cheryl Ewing Affidavit, ¶ 5; Exhibit D, Patricia Kuhse Affidavit, ¶ 5; and Exhibit E, Ray Lovell Affidavit, ¶ 5).  Plaintiff is a Christian and was receiving bible studies from the Rock of Ages Prison.  (Exhibit F, Plaintiff's Deposition, p. 7, l. 5-20; p. 9, l. 16-18). Plaintiff was using the self-addressed stamped envelopes from the Rock of Ages Prison

-23-

to send the bible studies back and she would then receive new bible studies. (Exhibit F, Plaintiff's Deposition, p. 7, l. 21-23; p. 8, l. 1-2). Plaintiff had a Bible in her possession and worked on a bible lesson every single day and continues to do so. (Exhibit F, Plaintiff's Deposition, p. 9, l. 6-8; p. 10, l. 9-10). Other inmates in segregation were having their self-addressed stamped envelopes confiscated. (Exhibit F, Plaintiff's Deposition, p. 11, l. 11-15).

Offenders in disciplinary segregation status were not allowed to attend communal religious activities due to their heightened security needs and status. (Exhibit B, Cahill-Masching Affidavit, ¶ 10; Exhibit C, Cheryl Ewing Affidavit, ¶ 6; Exhibit D, Patricia Kuhse Affidavit, ¶ 6; and Exhibit E, Ray Lovell Affidavit, ¶ 6). However, an inmate may subscribe to, solicit free copies of, or buy copies of newspapers, magazines, books and other publications for delivery to the facility. 20 Ill. Admin. Code §525.210(c). (Exhibit B, Cahill-Masching Affidavit, ¶ 10; Exhibit C, Cheryl Ewing Affidavit, ¶ 6; Exhibit D, Patricia Kuhse Affidavit, ¶ 6; and Exhibit E, Ray Lovell Affidavit, ¶ 6). A Chaplain was available to address religious concerns for inmates in segregation. (Exhibit B, Cahill-Masching Affidavit, ¶ 10; Exhibit C, Cheryl Ewing Affidavit, ¶ 6; Exhibit D, Patricia Kuhse Affidavit, ¶ 6; and Exhibit E, Ray Lovell Affidavit, ¶ 6). Plaintiff had access to a Chaplain who would come to segregation once a month. (Exhibit F, Plaintiff's Deposition, p. 14, l. 21-23; p. 15, l. 1-3). Plaintiff would talk with the Chaplain. (Exhibit F, Plaintiff's Deposition, p. 15, l. 13-15).

In 2001, an inmate who followed Christianity at Dwight Correctional Center could have practiced her religion in her cell by reading her Bible or other religious materials and praying. (Exhibit B, Cahill-Masching Affidavit, ¶ 11; Exhibit C, Cheryl Ewing Affidavit, ¶ 7; Exhibit D, Patricia Kuhse Affidavit, ¶ 7; and Exhibit E, Ray Lovell Affidavit,

¶ 7).  If the inmate had made a request through the Chaplaincy Department, the Chaplain could have come to her cell to address the inmate's religious issues or concerns.  (Exhibit B, Cahill-Masching Affidavit, ¶ 11; Exhibit C, Cheryl Ewing Affidavit, ¶ 7; Exhibit D, Patricia Kuhse Affidavit, ¶ 7; and Exhibit E, Ray Lovell Affidavit, ¶ 7).

Plaintiff believes that it was Defendant Ewing who was confiscating the self-addressed stamped envelopes.  (Exhibit F, Plaintiff's Deposition, p. 23, l. 7-10).  Self-addressed envelopes with pre-paid postage are considered contraband since they can be used and traded with other inmates like money.  (Exhibit B, Cahill-Masching Affidavit, ¶ 7; Exhibit C, Cheryl Ewing Affidavit, ¶ 3; Exhibit D, Patricia Kuhse Affidavit, ¶ 3; and Exhibit E, Ray Lovell Affidavit, ¶ 3).  Possessing contraband and trading and trafficking are a violation of Departmental rules.  20 Ill. Admin. Code 504 App. A, 20 Ill. Admin. Code 504 Table A.  Any correctional employee who observed an inmate having self-addressed envelopes would have confiscated same.  (Exhibit B, Cahill-Masching Affidavit, ¶ 7; Exhibit C, Cheryl Ewing Affidavit, ¶ 3; Exhibit D, Patricia Kuhse Affidavit, ¶ 3; and Exhibit E, Ray Lovell Affidavit, ¶ 3).

Prison administrators have a legitimate interest in reducing: 1) the potential ways an inmate could be taken advantage of by another inmate, 2) the possession of contraband, and 3) the violation of departmental rules.  Plaintiff has not proven that the decision to confiscate the self-addressed envelopes was motivated by any malice toward the Plaintiff or her religion or as a way to hinder the Plaintiff in the practice of her religion.  Instead, Defendants have proffered a penological interest in confiscating the self-addressed envelopes.  Additionally, Plaintiff had alternative means of practicing her religion by praying, reading her Bible, and interaction with the Chaplain.  Therefore, since there was a legitimate penological interest with confiscating self-addressed

envelopes and Plaintiff had alternative means to practice her religion, Defendants did not violate Plaintiff's First Amendment rights and summary judgment should be granted in their favor and against the Plaintiff.

**Magazines**

There was a valid penological interest in confiscating various issues of Plaintiff's Vibe magazine. Plaintiff had a one year subscription to Vibe but no subscription to Source, Right On, or Sister to Sister. (Exhibit F, Plaintiff's Deposition, p. 25, l. 1-14). Dwight Correctional Center at one time had a subscription to Source, Right On, or Sister to Sister. (Exhibit F, Plaintiff's Deposition, p. 26, l. 18-21). The magazine Plaintiff personally had confiscated was Vibe. (Exhibit F, Plaintiff's Deposition, p. 27, l. 16-19). However, Plaintiff was able to have a couple Vibe magazines. (Exhibit F, Plaintiff's Deposition, p. 28, l. 7-11).

Plaintiff had a conversation with Beatrice Standley who told the Plaintiff that she could not have the magazines because they were a threat to security. (Exhibit F, Plaintiff's Deposition, p. 29, l. 12-15; p. 30, l. 1-11). Ms. Standley told the Plaintiff that the decision was made by the Publication Review Committee. (Exhibit F, Plaintiff's Deposition, p. 30, l. 15-22). Plaintiff does not know if Caucasian magazines were confiscated during the time-frame of her complaint. (Exhibit F, Plaintiff's Deposition, p. 36, l. 6-9).

Mail Room staff review all incoming publications for questionable materials. (Exhibit B, Cahill-Masching Affidavit, ¶ 12; Exhibit C, Cheryl Ewing Affidavit, ¶ 8; Exhibit D, Patricia Kuhse Affidavit, ¶ 8; and Exhibit E, Ray Lovell Affidavit, ¶ 8). Questionable materials may include, but not be limited to, items showing or representing contraband, obscenity, security issues, or significant connections with gangs, i.e. materials that

contain or could raise potential security issues within the correctional center. (Exhibit B, Cahill-Masching Affidavit, ¶ 13; Exhibit C, Cheryl Ewing Affidavit, ¶ 9; Exhibit D, Patricia Kuhse Affidavit, ¶ 9; and Exhibit E, Ray Lovell Affidavit, ¶ 9). If publications come in that may contain questionable content, the publication may be forwarded to the Illinois Department of Corrections Central Publication Review Committee in Springfield, Illinois. (Exhibit B, Cahill-Masching Affidavit, ¶ 14; Exhibit C, Cheryl Ewing Affidavit, ¶ 10; Exhibit D, Patricia Kuhse Affidavit, ¶ 10; and Exhibit E, Ray Lovell Affidavit, ¶ 11).

The Central Publication Review Committee would then make the final decision concerning whether or not the publication would be accepted, denied, or approved with the removal of certain pages. (Exhibit B, Cahill-Masching Affidavit, ¶ 15; Exhibit C, Cheryl Ewing Affidavit, ¶ 11; Exhibit D, Patricia Kuhse Affidavit, ¶ 11; and Exhibit E, Ray Lovell Affidavit, ¶ 12). Plaintiff did not contact the Central Publication Review Committee to find out why she could not have issues of Vibe. (Exhibit F, Plaintiff's Deposition, p. 37, l. 19-22). The Central Publication Review Committee maintains a listing of various magazines which provides what issues are approved, disapproved, or approved with the removal of certain pages. (Exhibit B, Cahill-Masching Affidavit, ¶ 17; Exhibit C, Cheryl Ewing Affidavit, ¶ 13; Exhibit D, Patricia Kuhse Affidavit, ¶ 13; and Exhibit E, Ray Lovell Affidavit, ¶ 14). For the 2001 Vibe magazine, the January, February, March, April, May, June, and July issues were allowed if certain pages were removed. The issues for August, September, October, November, and December were disapproved in their entirety. (Exhibit C, Cheryl Ewing Affidavit, ¶ 16; Exhibit D, Patricia Kuhse Affidavit, ¶ 15; Exhibit E, Ray Lovell Affidavit, ¶ 17). Once a publication has been placed on the Central Publication Review Committee's disapproved list, the institution does not have the discretion to perform a further review and/or remove a

publication from the list.  (Exhibit B, Cahill-Masching Affidavit, ¶ 18; Exhibit C, Cheryl

Ewing Affidavit, ¶ 14; Exhibit D, Patricia Kuhse Affidavit, ¶ 14; and Exhibit E, Ray Lovell

Affidavit, ¶ 15).

Plaintiff has failed to prove a violation of her First Amendment rights.  Plaintiff

was told that her Vibe magazines were denied for security reasons which would be a

legitimate reason to have restricted her access to the magazine.  Plaintiff never had a

subscription to Source, Right On, or Sister to Sister, therefore, she cannot recover any

damages for said magazines.  Furthermore, Plaintiff was not denied total access to

Vibe as she has admitted that she was able to have some issues of the magazine.

Finally, Plaintiff has not proven that confiscating Vibe or pages from it would be an

exaggerated response to a potential problem.  Therefore, Plaintiff has failed to prove a

First Amendment violation and summary judgment on this issue should be granted in

favor of the Defendants and against the Plaintiff.

Likewise, Plaintiff has failed to prove that her equal protection and due process

rights were violated when issues of Vibe magazine were confiscated.  Plaintiff's

complaint appears to be that she was not being treated exactly the same as other

inmates in prison.  However, simply receiving different or unfair treatment is not enough

to raise an equal protection violation.  Furthermore, Plaintiff does not know if Caucasian

inmates had their magazines confiscated.  Therefore, Plaintiff cannot prove that she

was a member of an identifiable class to the exclusion of all others.  As for due process,

Plaintiff has not proven what process she was denied.  The final determination

concerning the magazine was made by the Central Publication Committee yet Plaintiff

never attempted to contact the Central Publication Committee to find out why she could

not have the issues of Vibe magazine or contest the confiscation thereof.  Thus,

Plaintiff has failed to prove an equal protection and due process violation and summary judgment on these issues should be granted in favor of the Defendants and against the Plaintiff.

**Mail**

There was a valid penological interest in searching Plaintiff's mail and Plaintiff's litigation did not suffer from the mail being late.  The Mail Room staff was responsible for determining the legitimacy of every piece of incoming and outgoing offender mail before releasing the mail for delivery to the offender or the post office.  (Exhibit B, Cahill-Masching Affidavit, ¶ 21; Exhibit C, Cheryl Ewing Affidavit, ¶ 21; Exhibit D, Patricia Kuhse Affidavit, ¶ 18; and Exhibit E, Ray Lovell Affidavit, ¶ 20).  Defendants Snyder, Cahill-Masching, Ford, Lovell, Kuhse, and Johnson did not have any personal involvement concerning the legitimacy of mail or how it is processed.  (Exhibit A, Melody Ford Affidavit, ¶ 11; Exhibit B, Cahill-Masching Affidavit, ¶ 22; Exhibit D, Patricia Kuhse Affidavit, ¶ 19; and Exhibit E, Ray Lovell Affidavit, ¶ 10).  Defendant Kuhse's only involvement with the Plaintiff's mail would have been to deliver it to her at her cell.  (Exhibit D, Patricia Kuhse Affidavit, ¶ 20).

There are two types of incoming mail, privileged and non-privileged.  20 Ill. Admin. Code §525.140.  Incoming privileged mail is mail from the: 1) Director of the Illinois Department of Corrections; 2) deputy and assistant deputy directors of the Illinois Department of Corrections; 3) Department of Corrections attorneys; 4) members from the Administrative Review Board; 5) members of the Prison Review Board; 6) Illinois Governor; 7) federal or Illinois legislators; 8) Chief Executive Officers from the FBI, DEA, Criminal Division of the Department of Justice, U.S. Customs Service, Secret Service, Illinois State Police, and Illinois Sheriff's offices and Police departments; 9)

John Howard Association; and 10) legal mail.  20 Ill. Admin. Code §525.110(e)(1-10).

(Exhibit C, Cheryl Ewing Affidavit, ¶ 22).  Non-privileged incoming mail would be mail

from the clerks of courts and mail not meeting the definition of privileged incoming mail.

20 Ill. Admin. Code §§ 525.140(d), 525.110.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 23).

Outgoing privileged mail is mail to: 1) the Director; 2) Associate Director, Chiefs,

Deputy Directors, Deputy Chiefs, and Assistant Deputy Directors of the Department; 3)

Department attorneys; 4) Members of the Administrative Review Board; 5) Members of

the Prisoner Review Board; 6) the Governor of Illinois; 7) Federal or Illinois legislators;

8) Chief Executive Officers of the Federal Bureau of Investigation, the Drug

Enforcement Administration, the Criminal Division of the Department of Justice, the

United States Customs Service, the Secret Service, the Illinois State Police, and

Sheriff's Offices and Police Departments in the State of Illinois; 9) John Howard

Association; 10) Clerks of courts or of the Illinois Court of Claims; and 11) Legal mail.

(Exhibit C, Cheryl Ewing Affidavit, ¶ 24).  Legal mail is defined as mail from: 1)

registered attorneys, but not including Illinois Department of Corrections attorneys; 2)

the Illinois Attorney General's Office; 3) Judges or Magistrates of any court and Judges

from the Illinois Court of Claims; and 4) any organization that provides legal

representation to incarcerated individuals, but that does not include referral agencies.

20 Ill. Admin. Code §525.110(g)(1-4).  (Exhibit C, Cheryl Ewing Affidavit, ¶ 25).

Legal mail would be opened only if the legitimacy could not be substantiated

from information available on the outside of the mailing.  (Exhibit C, Cheryl Ewing

Affidavit, ¶ 26; Exhibit D, Patricia Kuhse Affidavit, ¶ 21).  Legitimate legal mail from

recognized attorneys was opened in the offender's presence, checked for contraband

and scanned to ensure it is legal mail from the noted correspondent.  (Exhibit C, Cheryl

Ewing Affidavit, ¶ 27; Exhibit D, Patricia Kuhse Affidavit, ¶ 22; Exhibit G, Johnson's Responses to Plaintiff's Second Interrogatories, request # 5-6).  Mail inappropriately marked as legal mail or from correspondents not recognized by the Department of Corrections as legal was inspected and read for content as non-privileged mail.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 27; Exhibit D, Patricia Kuhse Affidavit, ¶ 22).

Plaintiff wrote the ACLU and NAACP to seek if they would represent her.  (Exhibit F, Plaintiff's Deposition, p. 38, l. 13-17).  The ACLU did not say they would represent the Plaintiff and the NAACP was assisting Plaintiff by telling her to use the grievance procedure.  (Exhibit F, Plaintiff's Deposition, p. 38, l. 21-23; p. 39, l. 1-9).  Plaintiff did not speak with any particular attorney with the NAACP.  (Exhibit F, Plaintiff's Deposition, p. 44, l. 4-7).  Mail addressed to the NAACP or ACLU was not considered legal mail as said agencies were considered referral agencies.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 28).  If mail to said entities had been addressed to a specific attorney, the correspondence could have been considered legal mail.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 28).

Additionally, mail being returned to sender from the United State Post Office as non-deliverable was opened and inspected for non-legal contents such as contraband or unauthorized communications between offenders.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 29).  It is not uncommon for inmates to communicate with each other in violation of Departmental rules by placing another inmate's return address on the envelope and sending it out to an entity knowing it would be returned as undeliverable in the hopes of having the correspondence delivered to the inmate whose name appears as the return addressee.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 29).  Therefore, mail being returned as

non-deliverable was opened to ensure that the offender noted as the return addressee actually generated the enclosed correspondence. (Exhibit C, Cheryl Ewing Affidavit, ¶ 29). If the mail appeared to be in compliance, it was not read for content before being returned to the offender. (Exhibit C, Cheryl Ewing Affidavit, ¶ 29). Legal mail for offenders in strip cells or out of the facility was returned to the Mail Room unopened and re-issued when the offender had been removed from the strip cell or returned from being out of the facility. (Exhibit C, Cheryl Ewing Affidavit, ¶ 30; Exhibit D, Patricia Kuhse Affidavit, ¶ 23).

Due to the large amounts of mail received and to be delivered, Plaintiff's legal mail was never read for content. (Exhibit C, Cheryl Ewing Affidavit, ¶ 31; Exhibit D, Patricia Kuhse Affidavit, ¶ 24). Instead, a quick visual scan of the mail would be done to determine that the mail was legal in nature. (Exhibit C, Cheryl Ewing Affidavit, ¶ 31; Exhibit D, Patricia Kuhse Affidavit, ¶ 24; Exhibit G, Johnson's Responses to Plaintiff's Second Interrogatories, requests # 5-6). If it was, it was processed as legal mail. (Exhibit C, Cheryl Ewing Affidavit, ¶ 31; Exhibit D, Patricia Kuhse Affidavit, ¶ 24).

Concerning the lateness of the mail and her litigation, Plaintiff once had a federal case in the Central District in which there was a ruling and her case was dismissed. (Exhibit F, Plaintiff's Deposition, p. 71, I. 16-20). However, Plaintiff wrote the Court, explained what happened, and her case was re-instated. (Exhibit F, Plaintiff's Deposition, p. 71, I. 20-23; p. 72, I. 11; p. 76, I. 12-16). Any other time she had a delay with a court deadline, she was able to get an extension. (Exhibit F, Plaintiff's Deposition, p. 76, I. 17-23; p. 77, I. 1-3).

There is a legitimate penological interest in insuring that an inmate's mail is what it is purported to be and not an attempt to circumvent Departmental rules. For Plaintiff's

mail to the ACLU and NAACP, Plaintiff has admitted that they either did not represent her or she was not addressing the mail to a particular attorney. Given this information, the ACLU and NAACP were acting as referral agencies and mail to them was not considered "legal mail". As for Plaintiff's mail that was opened that was stamped "return to sender", mailroom staff knew that this type of mail was a common way in which inmates tried to correspond with each other. While Plaintiff may have send out her mail for legitimate reasons, the Defendants do not know that when it comes back to the mailroom stamped "return to sender" and the only way to verify what the mail is, is to open it. As for the lateness of Plaintiff's mail in her litigation, Plaintiff did not suffer any harm as she was allowed to proceed with her litigation despite any alleged lateness. Therefore, summary judgment on these issues should be granted in favor of the Defendants and against the Plaintiff.

Likewise, Plaintiff has not proven that Defendants had knowledge of her grievances and lawsuits and their disposition prior to the denial of the "legal mail" status for her mail. Plaintiff's denial of "Legal Mail" status to her correspondence with the ACLU and the NAACP and/or the denial of indigent envelopes to her was not done in retaliation for her legal activities and writing of grievances. (Exhibit C, Cheryl Ewing Affidavit, ¶ 18; Exhibit D, Patricia Kuhse Affidavit, ¶17). Defendant Ewing would not have looked at an inmate's masterfile prior declining "Legal Mail" status to see what grievances Plaintiff had or had not filed and Defendant Ewing had no personal involvement in the handling of inmate grievances and lawsuits against Dwight Correctional Center or it's staff. (Exhibit C, Cheryl Ewing Affidavit, ¶ 19). Even if the Plaintiff had filed grievances and a lawsuit against Dwight Correctional Center employees, Defendant Ewing would have still been required to ensure that the Plaintiff

did not receive or send mail that could possibly be considered contraband.  (Exhibit C, Cheryl Ewing Affidavit, ¶ 20).  Since Plaintiff has failed to prove retaliation, summary judgment should be entered in favor of the Defendants and against the Plaintiff.

### QUALIFIED IMMUNITY

### APPLICABLE LAW

In addition, Defendants are entitled to qualified immunity.  In order for a Plaintiff to defeat a qualified immunity claim, he must prove the Defendant(s) violated a constitutional right that was clearly established at the time of the alleged misconduct. McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).  The burden of establishing the existence of such a clearly established constitutional right is on plaintiff.  Id. at 570 (citing Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988).  He must point out a closely analogous case that establishes that he had a right to be free from the specific conduct alleged to violate the general constitutional right at issue.  Rice v. Burks, 999 F.2d 1172, 1174 (7th Cir. 1993).  Although this is a substantial barrier for a Plaintiff, it is appropriate because qualified immunity is designed to shield from civil liability all but the plainly incompetent and those who knowingly violate the law.  Kernats v. O'Sullivan, 35 F.3d 1171, 1177 (7th Cir. 1994).

Plaintiff must also establish that the alleged violated rights were so clear that a reasonable official would understand that what he is doing at the time violates that right. McGrath, 44 F.3d at 570; See also Anderson v. Creighton, 483 U.S. 635 (1987).  Under Anderson, 483 U.S. 635 (1987), the court's review of existing case law should focus on "particularized" facts and concrete legal principals to clarify the law in relation to each defendant's conduct at the time the conduct occurred.

## <u>ARGUMENT</u>

**DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

In the case at bar, Plaintiff has not demonstrated that Defendants had any notice that the acts they were performing as they performed them would be a violation of a clearly established right. There is nothing to indicate that Defendants were personally involved in many of the alleged violations of Plaintiff's constitutional rights. Without personal involvement, Plaintiff cannot sustain a suit against the Defendants. Penological interests existed in confiscating the self-addressed envelopes, denying various issues of <u>Vibe</u> magazine, and in handling the Plaintiff's mail. There was no case at the time that would have put the Defendants on notice that doing everything that they did in the way that they did it and when they did it would have violated Plaintiff's constitutional rights. As such, Defendants are entitled to qualified immunity and summary judgment should be entered in their favor and against the Plaintiff.

WHEREFORE, for the foregoing reasons, Defendants respectfully pray that this Honorable Court enter summary judgment in favor of the Defendants and against the Plaintiff.

Respectfully submitted,

CHERYL EWING, LYNN CAHILL-MASCHING, DONALD SNYDER, MELODY FORD, RAY LOVELL, PATRICIA KUHSE, and DON JOHNSON,

Defendants,

LISA MADIGAN, Attorney General
State of Illinois,

Attorney for Defendants,

By: s/Julie L. Morgan
Julie L. Morgan, #6271352
Assistant Attorney General
Attorney for Defendants
Office of the Illinois Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 557-0261
Facsimile:  (217) 524-5091
jlmorgan@atg.state.il.us

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

LINDA CALDWELL, B-07089,                        )
                                                )
            Plaintiff,                          )
                                                )
    v.                                          ) No.  03-1417
                                                )
CHERYL EWING, THE PUBLICATION REVIEW            )
COMMITTEE, VALERIE LARSON, WARDEN               )
LYNN CAHILL-MASCHING, DONALD SNYDER,            )
MELODY FORD, DUANE TUCKER, CENTRAL              )
PUBLICATION REVIEW COMMITTEE, RAY               )
LOVELL, DOROTHEY CALKIN, PATRICIA               )
KUHSE, DORETTA O'BRIEN, LIEUTENANT              )
JOHNSON, GLENN DAVIDSON,                        )
                                                )
            Defendants.                         )

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2005, I electronically filed Defendants'

Memorandum of Law in Support of Motion for Summary Judgment with the Clerk of Court

using the CM/ECF system which will send notification of such filing to the following:

and I hereby certify that on August 22, 2005, I mailed by United States Postal Service, the

document to the following non-registered participant:

Linda Caldwell, B-07089
Dwight Correctional Center
23813 E. 3200 North Road
Dwight, IL 60420-5001

Respectfully submitted,
 s/Julie L. Morgan
Julie L. Morgan, #6271352
Attorney for Defendants
Office of the Illinois Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 557-0261
Facsimile:  (217) 524-5091
jlmorgan@atg.state.il.us